Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000914
30-MAY-2017
05:22 PM

NO. CAAP-14-0000914

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


MUKADIN GORDON, Plaintiff-Appellant, v.
JODIE F. MAESAKA-HIRATA; FRANCIS SEQUIERA;
WILLIAM RUSHING; FAATUILA PULA; PETRA CHO;
MICHAEL TAAMILO; AARON MIRAFUENTES; GENE POMEROY;
STATE OF HAWAII, Defendants-Appellees, and
JOHN AND/OR JANE DOES 1-10, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 11-1-2482-10 (ECN))


MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Reifurth and Ginoza, JJ.)

Plaintiff-Appellant Mukadin Gordon (**Gordon** or

**Plaintiff**) appeals from the June 19, 2014 Judgment in favor of

Defendants-Appellees the State of Hawai'i (the **State**), Jodie F.

Maesaka-Hirata (**Maesaka-Hirata**), and Petra Cho (**Cho**)

(collectively, **Defendants**) and against Gordon (**Judgment**), and

challenges the April 23, 2014 Findings of Fact and Conclusions of

Law (**FOFs/COLs**), both entered in the Circuit Court of the First

Circuit (**Circuit Court**).[1]

---

[1]    The Honorable Edwin C. Nacino presided.

' Gordon filed suit alleging violation of his constitutional rights, as well as tort claims, against the State and employees of the Department of Public Safety, State of Hawai'i (**DPS**), contending that he was unfairly confined to maximum security imprisonment (**Max Custody**) for an extended period of time during his pre-trial detention, due to a misclassification of his security level. After a bench trial, the Circuit Court held, *inter alia*, that the conditions imposed on Gordon did not amount to punishment, and that the DPS officials acted within their discretion. We affirm.

I.   BACKGROUND FACTS

A.   Gordon's Pre-Trial Detainment

On August 22, 2010, Gordon was arrested and detained at Oahu Community Correctional Center (**OCCC**) on charges of seven counts of Sexual Assault in the First Degree, Attempted Sexual Assault in the First Degree, four counts of Sexual Assault in the Third Degree, Promoting Prostitution, and Kidnapping in the First Degree. On August 26, 2010, DPS employee Faatuila Pula (**Pula**) completed Gordon's Jail Initial Custody Classification, which determines an inmate's custody classification. Pula later testified that she calculated Gordon's "points"[2] at nineteen, which classifies an inmate as Max Custody. Pula testified that, in completing the Jail Initial Custody instrument, she interviewed Gordon and used information from the Hawaii Criminal Justice Information System (**CJIS**), as well as the National Crime

---

[2]     It appears that Pula's testimony concerning "points" refers to a scoring system used for recommendations concerning security levels applicable to persons when they come into custody at OCCC.

Information Center (NCIC) records. Pula testified that CJIS showed that Gordon had a "pending" Hawai'i charge for Sexual Assault in the First Degree from 2006, for an unrelated matter, and that Pula factored in this pending charge in calculating Gordon's points. Pula testified that factoring in this pending charge would have affected the number of points in Gordon's classification. Gordon testified that, during the interview, he told Pula that he had no pending charges at that time. Pula testified that a failure to appear at a hearing would have shown up in the CJIS as a pending charge and that the CJIS is something that she ordinarily relies on in calculating detainees' custody levels when they come in to OCCC.

It appears, however, from the testimony of Correction Supervisor and DPS employee Cho, that the 2006 sexual assault charge had in fact been resolved at the time the initial classification was completed. Thus, the initial classification was based, in part, on information that was later determined to be incorrect. Pursuant to Pula's initial classification, Gordon was held in the OCCC Holding Unit at Max Custody for thirty days. Gordon testified that under the conditions of Max Custody, he was locked in his cell for twenty-three hours a day, had limited access to showers, and had limited access to reading material.

Cho testified that on September 22, 2010, a month after Gordon's arrest and detention, an administrative program committee (the **Committee**) conducted a hearing to further determine Gordon's security custody classification, programming needs, and the appropriateness of his housing. Cho testified

NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

that the Committee took into consideration several aspects of Gordon's history, including the pending criminal charges, prior convictions, Gordon's statements, as well as the information that Gordon had "absconded" to Washington while he was on probation in Hawai'i. The Committee memorialized its decision in a Notice of Programing Results (**Classification Notice**). The Classification Notice recommended that Gordon remain in Max Custody due to the nature and seriousness of his current charges, the number and kind of his prior convictions, his extensive criminal history and numerous periods of incarceration, his failure to comply with two residential drug treatment programs, his leaving the state without permission while on probation and subsequest extradition to Hawai'i, the fact that Gordon was on probation when charged with his current offenses, and the $1,000,000.00 bail amount. The Classification Notice also stated:

> The Committee concurs with OISC Jail Initial Custody instrument that classified Mr. GORDON as MAX and also recommends that he be housed accordingly at Halawa High Security. The Committee deems MR. GORDON a high-risk inmate and also, a high flight risk. OCCC is inappropriate housing for Mr. GORDON because OCCC is not able to provide MR. GORDON with the high degree of direct supervision that he requires.

Cho testified that an inmate who has been classified as Max Custody needs more supervision by the security staff, especially when he is out of his cell, and the Committee felt that the level of supervision needed for Gordon could not be provided at OCCC. Cho further testified that, at the time she signed the Classification Notice, she was aware that the 2006 sex assault charge was no longer pending, but that the Committee nonetheless decided that Gordon should remain at Max Custody.

On September 29, 2010, Gordon filed an Inmate Complaint/Grievance with DPS, disputing his pretrial detention in Max Custody. On October 5, 2010, Cho received a memorandum regarding the custody and classification of Max Custody inmates at OCCC from her supervisor, Lance M. Rabacal (**Rabacal**), administrator for the residency section at OCCC (the **Rabacal Memo**). The Rabacal Memo directed Cho to "adhere to the directive process that has been consistently utilized at our facility pertaining to MAX custody inmates" as "[t]he concern of constitutional matters may come into play," and that they should assure "fairness and consistency" when making decisions. The Rabacal Memo referred to a November 1996 directive that set out a process that had been set up, through arrangement with the American Civil Liberties Union, regarding OCCC Max Custody inmates (**ACLU Arrangement**). Rabacal testified that the ACLU Arrangement is a "practice" that OCCC had been following "for quite a while," that they understood its terms to be a "recommendation," and that classification decisions may still be "determinant upon [an inmate's] . . . behavior or his record[.]" The ACLU Arrangement provided, in relevant part:

> 1) Any Max Custody inmate entering through the Intake process shall be housed in the Holding Unit for 30 days.
>
>> a) If the inmate remains misconduct free and is not a management problem, OCCC shall then reduce the inmate's custody to Medium and re-house in general population.
>>
>> b) Contrastingly, if the inmate incurs misconducts during the 30-day period, and/or is a management problem, he shall be transferred to [Halawa Correctional Facility (HCF)] as a Max custody.
>> . . . .
>
> Jail inmates who come in scoring MAX are not to be shipped directly to HCF. Follow this process.

On October 12, 2010, an Exception Case Form[3] was submitted for Gordon under Cho's name, recommending a custody classification of "Medium" for Gordon. The reasons stated for the recommendation included the Rabacal Memo and that Gordon "has not shown nor accrued any institutional behavioral misconducts within OCCC holding unit." Linda Chun (**Chun**), the DPS Classification Officer at that time, testified that she had received the Exception Case Form, and that she disapproved it on October 19, 2010, as noted on the form. The reasons given for disapproval were as follows:

> [Gordon]'s behavior in the [Holding Unit] has been satisfactory thus far. However this case still presents a number of risk factors. Current charges are serious & violent in nature. As a result, subject has a high bail amount. Subject has an extensive criminal his[tory] & also has had numerous periods of incarceration. Subject has failed to profit from previous experience [with] probation & incarceration. Substance abuse issues have not been addressed due [to] subject's discharge from programs for non-compliance [with] program rules.

Chun testified that a pretrial detainee can be held in Max Custody based solely on their past behavior and criminal history. Chun testified that, based on her training and experience, it is "reasonable" to house an inmate as a Max Custody pretrial detainee based on the reasons stated in the disapproval section of the Exception Case Form. She also testified that, by policy, if the Classification Office disapproves a request for an exception case, the matter is submitted to the deputy director for review. The Deputy Director of Corrections, Tommy Johnson (**Johnson**), testified that on

---

3    Cho testified at trial that erroneous classifications are corrected through an Exception Case Form process, and that the Inmate Classification Office makes a decision based on the Exception Case request.

October 21, 2010, he reviewed Gordon's Exception Case Form and determined that Gordon was to remain in Max Custody. He testified that he did not have any personal knowledge of any of the factors on the Exception Case Form, but that he "signed the document because of the statement written above it" which he "believed . . . to be true[.]" Johnson further testified that he did not perceive Gordon's custody level as punishment.

On October 25, 2010, Gordon was transported from OCCC to HCF where he was placed in Max Custody. Gordon testified that, during this time, he was locked in his cell for twenty-three hours a day, had limited access to showers, and was subject to daily strip searches. Gordon submitted grievances to DPS regarding his classification as Max Custody on October 26, 2010, December 21, 2010, February 21, 2011, February 25, 2011, March 8, 2011, and on March 24, 2011. On June 14, 2011, Corrections Supervisor Monica Lortz (**Lortz**) completed a Jail Inmate Custody Review Instrument.[4] Based on Lortz's testimony at trial, the classifications for inmates in Max Custody are evaluated once a year. However, according to Lortz's testimony, in Gordon's case, this review was conducted after only eight months, and was done per instructions from the deputy warden, rather than pursuant to a periodic review. Lortz arrived at a Comprehensive Total Point Score of thirteen, making Gordon's computed custody level "Medium." Due to the decrease in Gordon's custody level, Gordon

---

[4] Gordon also asserts that, prior to the completion of Lortz's review, on February 23, 2011, DPS employee Earl Pomeroy also "completed" a Jail Initial Custody Instrument (Amended) for Gordon that calculated a "Minimum" custody level. However, the last page of this custody instrument shows that it is saved only as a draft, and it does not appear to have been "completed" as Gordon contends.

was returned to OCCC in June of 2011. Following Gordon's felony convictions and sentencing, he was returned to HCF in September of 2011, where he remains. In total, Gordon spent over nine months in Max Custody due to his classification.

B.    The Circuit Court Proceedings

Gordon filed a complaint on October 19, 2011, alleging claims against Defendants Clayton Frank (**Frank**), Francis Sequiera (**Sequiera**), William Rushing (**Rushing**), Pula, Cho, Michael Taamilo (**Taamilo**), Aaron Mirafuentes (**Mirafuentes**), Gene Pomeroy (**Pomeroy**), and the State, arguing, *inter alia*, that he was misclassified by the Defendants and, therefore, housed in more restrictive areas of OCCC and HCF than he should have been. Gordon's complaint alleged violations of civil rights guaranteed to him as a pretrial detainee under the Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, and under Article I, §§ 2, 5, 6, 7, 8, and 12 of the Hawai'i Constitution. The complaint included claims of intentional infliction of emotional distress, negligence, and respondeat superior negligence against individually named Defendants Sequiera, Rushing, Pula, Cho, Taamilo, Mirafuentes, and Pomeroy, as well as alleged negligent training, supervision and discipline claims against Defendants Frank and the State. On November 29, 2011, Gordon filed a first amended complaint, replacing Defendant Frank with Defendant Jodie F. Maesaka-Hirata. Defendants answered on December 19, 2011.

On December 23, 2013, Defendants filed a motion for summary judgment (**MSJ**), arguing that no constitutional right was

violated, as prisoners have no right to receive a particular security classification, that the claims are barred by sovereign immunity, and that Defendants, in their individual capacities, have qualified immunity. In support of the qualified immunity defense, Defendants argued that Gordon's initial classification was calculated correctly, that subsequent classification decisions were within the prison administrators' discretion, and that Defendants have qualified immunity from the state-law tort claims. On December 12, 2013, the parties filed a Stipulation for Dismissal with Prejudice of All Claims Against Defendant Faatuila Pula.

On January 8, 2014, Gordon filed an opposition to the MSJ and a cross-motion for partial summary judgment as to Defendants' liability for Gordon's state law claim for negligence. Gordon argued that, as a pre-trial detainee, he had a constitutional right to be free from punishment, and that his negligence claims against the State are based on the failure of DPS employees to follow standard classification practices. He further argued that Defendants, in their individual capacities, are not entitled to sovereign or qualified immunity for the constitutional and state-law tort claims because "sufficient evidence has been presented to demonstrate that Defendants[] deliberately disregarded their own directives and failed to address 'constitutional matters' and 'assure fairness and consistency.'"

A hearing on the motions appears to have been held on January 16, 2014.[5] On January 27, 2014, the Circuit Court filed its Order (1) Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, and (2) Denying Plaintiff's Cross-Motion for Partial Summary Judgment as to Defendants' Liability for Plaintiff's State Law Claim for Negligence. Regarding Defendants' MSJ, the order: (1) granted it as to the 42 U.S.C. § 1983 claims alleging federal constitutional violations against the State and the individual Defendants in their official capacities; (2) denied it as to the 42 U.S.C. § 1983 claims alleging federal constitutional violations against individual Defendants in their individual capacities; and (3) denied it as to the state-law tort claims. The order also denied Gordon's partial summary judgment motion as to Defendants' liability for Gordon's state law negligence claim.

On February 10 and 11, 2014, a jury-waived trial was conducted. The Circuit Court heard testimony from Gordon, Pula, Cho, Chun, Johnson, Lortz, and Rabacal. After Gordon rested his case, Defendants filed a motion for judgment as a matter of law (**Motion for JMOL**), arguing that Gordon failed to prove by clear and convincing evidence that the government officials were motivated by malice, failed to show that Defendants breached any duty, and failed to prove that he has a constitutional right to any particular security classification. In response to the Motion for JMOL, Gordon orally moved to dismiss from the lawsuit Sequiera, Rushing, Taamilo, Mirafuentes, and Pomeroy, conceding

---

[5]    A transcript of this hearing is not found in the record.

that there is "insufficient evidence to assert that any of these individuals acted improperly or there's sufficient merit for them to be responsible." The Circuit Court then noted that the remaining parties in the lawsuit were the State, Maesaka-Hirata, in her official capacity, and Cho, in her individual and official capacities. The court then heard argument on the Motion for JMOL. After hearing argument, the court orally denied Defendants' Motion for JMOL. Defendants then orally moved for reconsideration, and, after hearing argument, the court denied the motion.

On February 18, 2014, the Circuit Court filed an Order Granting Plaintiff's Motion to Dismiss with Prejudice All Claims Against Defendants Francis Sequiera, William Rushing, Michael Taamilo, Aaron Mirafuentes, and Gene Pomeroy. On February 19, 2014, the court filed an Order Denying Defendants' Motion for JMOL and Motion for Reconsideration of Order Denying Defendants' Motion for JMOL.

On April 23, 2014, the court issued its FOFs/COLs. The FOFs/COLs include, inter alia, the following findings:

> 13. State of Hawai'i Department of Public Safety employee, Faatuila Pula, testified credibly that on August 26, 2010 she calculated Plaintiff's points at 19 for holding purposes and Ms. Pula classified him to be held in Maximum Custody.
>
> 14. Ms. Pula further testified that in completing the Jail Initial Custody Instrument, she interviewed Plaintiff, and used the Hawaii Criminal Justice Inquiry System or CJIS, as well as NCIC records.
>
> 15. Ms. Pula testified that CJIS showed that Plaintiff had a pending Hawaii charge for sex assault one.
>
> 16. Ms. Pula also testified that a failure to appear at a hearing is counted as a pending or no-show appearance.
>
> 17. The Court finds that Plaintiff's initial custody level was calculated correctly by Faatuila Pula pursuant to

the State's policy for calculating initial custody classification.

. . . .

21.     Lance M. Rabacal testified credibly that [the ACLU Arrangement] is used as a guideline to determine when a recommendation to reduce custody shall be considered.

22.     Defendant Petra Cho testified credibly that on September 22, 2010, an administrative committee comprised of Defendants CHO, MICHAEL TAAMILO, and AARON MIRAFUENTES conducted a hearing to determine Plaintiff's security/custody classification, programming needs, and appropriateness of housing.

23.     Defendant Cho testified credibly that the committee took into consideration all aspects of Plaintiff's history, including his current offenses, prior convictions, and Plaintiff's statements.

24.     Defendant Cho further testified that she and the committee were aware that the Hawaii sex assault charge referred to in paragraph 15 above was no longer pending, but still came to the determination that Plaintiff should remain at maximum custody for the reasons cited in the following paragraph.

25.     The committee found and concluded that Plaintiff should remain at the classification of maximum custody due to:
-     The nature and seriousness of his current charges;
-     The number and kind of his prior convictions;
-     His extensive criminal history and numerous periods of incarceration;
-     His failure to comply with two residential drug treatment programs;
-     Leaving the state without permission while on probation;
-     His extradition to Hawaii;
-     The fact that [Gordon] was on probation when charged with his current offenses;
-     His $1,000,000.00 bail amount; and
-     other factors identified in the committee's Amended Notice of Programming Results.

26.     The committee wrote further:

**Comments:**
The Committee concurs with OISC Jail Initial Custody instrument that classified Mr. GORDON as MAX and also recommends that he be housed accordingly at Halawa High Security.  The Committee deems MR. GORDON a high-risk inmate and also, a high flight risk. OCCC is inappropriate housing for Mr. GORDON because OCCC is not able to provide MR. GORDON with the high degree of direct supervision that he requires.

27.     Defendant Cho explained that an inmate who has been classified as maximum custody needs more supervision by the security staff, especially when he is out of his cell, and the committee felt that that level of supervision for Plaintiff could not be provided at OCCC.

28. Defendant Cho testified credibly that she has never had any malice or ill-will towards Plaintiff or would knowingly violate Plaintiff's constitutional rights and Plaintiff produced no evidence to the contrary.

. . . .

36. The [DPS] Classification Office makes the definitive decision whether to reduce an inmate's custody level.

37. In making this definitive decision, the [DPS] Classification Office looks at the totality of the circumstances.

38. Linda Chun, retired [DPS] Classification Officer, testified that on October 19, 2010, she disapproved Plaintiff's Exception Case Form that would have reduced Plaintiff to Medium custody.

39. Ms. Chun testified credibly that the reasons provided for disapproval were that although Plaintiff's behavior in the Holding Unit has been satisfactory thus far this case still presents a number of risk factors. Current charges are serious & violent in nature. As a result, subject has a high bail amount. Subject has an extensive criminal history & also has had numerous periods of incarceration. Subject has failed to profit from previous experience with probation and incarceration. Substance abuse issues have not been addressed due to subject's discharge from program for non-compliance with program rules.

40. The Court found that Ms. Chun testified credibly that a pretrial detainee can be held as maximum custody based solely on their past behavior and criminal history.

41. Ms. Chun, based on her training and experience, believed it is reasonable to house an inmate as a maximum security pretrial detainee based on the kinds of reasons and considerations in paragraph 39 above and the Plaintiff produced no evidence to the contrary.

42. By policy, if the Classification Office disapproves a request for an exception case, the matter is submitted to the deputy director for review.

43. Deputy Director of Corrections, Tommy Johnson, testified that on October 21, 2010, he denied Plaintiff's Exception Case Form that had been submitted on October 12, 2010, and stated that Plaintiff was to remain in Max Custody.

44. Mr. Johnson testified that he did not perceive Plaintiff's custody level as punishment.

. . . .

50. Defendants presented evidence that all MAX Custody inmates, whether pretrial or not, are treated under the same conditions as Plaintiff.

51. Defendant[s] also presented evidence that Plaintiff was afforded additional benefits such as personal calls that were not given to other inmates on the same floor.

. . . .

55.   The Court finds no evidence of any kind was presented by Plaintiff in support of his claims against Defendant Maesaka-Hirata.

(Circuit Court's record cites and internal quotation marks omitted).

The FOFs/COLs include, *inter alia*, the following conclusions of law:

15.   The Court concludes that Plaintiff was subjected to the same restrictions and conditions of the other maximum custody inmates, whether pre-trial detainee or sentenced.

16.   Based on the lack of substantive evidence produced by the Plaintiff showing that Defendants categorized him as a maximum custody pre-trial detainee purely to impose punishment upon him, the Court concludes that there was no infringement of his constitutional rights.

17.   The Court further concludes that the Defendants' conditions imposed upon individuals categorized as maximum custody and, experienced by Plaintiff, is reasonably related to a legitimate government objective which is to maintain a safe and secure correctional facility.

18.   The Court concludes that there was no evidence produced by Plaintiff to prove by a preponderance of the evidence that the conditions of maximum custody imposed by Defendants to maintain a safe and secure correctional facility were excessive to accomplish such objective nor expressly intended as punishment.

19.   Based upon the credible testimony of Defendant Cho and Mr. Rabacal, by submitting the Exception Form, the Court concludes that Defendant Cho did comply with the guidelines of the MAX Custody Memo.

20.   Based on the totality of the facts, various documents in evidence and credible trial testimony, and the lack of any evidence to the contrary, the Court concludes that the restrictions and conditions Plaintiff was subjected to did not amount to punishment. Compare Bell v. Wolfish, 441 U.S. 520 (U.S. 1979) (holding that double-bunking, body-cavity searches, the prohibition against the receipt of packages, or the room search only rule did not amount to punishment under the facts of the case), and Block v. Rutherford, 468 U.S. 576 (U.S. 1984) (holding that a blanket prohibition on contact visits with pretrial detainees and shakedown searches of pretrial detainees' cells outside their presence does not amount to punishment), with Anela v. Wildwood, 790 F.2d 1063 (3d Cir. N.J. 1986) (holding that failing to provide beds or mattresses and food and drinking water amounted to punishment), and Demery v. Arpaio, 378 F.3d 1020, 1033 (9th Cir. Ariz. 2004) (holding that the sheriff's policy of transmitting live images over the internet of pretrial detainees by webcam was an excessive response to the purpose assigned to it).

21. Based on the credible evidence presented by Defendants and the lack of any evidence to the contrary, Defendant Cho, in her individual capacity, has qualified immunity from Plaintiff's 42 U.S.C. § 1983 claims because she did not knowingly violate Plaintiff's Constitutional rights and the Court concludes that Plaintiff did not suffer Punishment.

. . . .

25. Based on the credible evidence presented by the Defendants and the lack of evidence to the contrary, the Court concludes that all Defendants acted reasonably in considering other factors of Plaintiff's criminal history to reach the conclusion that he should remain in maximum custody.

26. Based on the totality of the facts, documents in evidence and the lack of any evidence to the contrary, the plaintiff has not met its burden to demonstrate that SOH and/or its employees breached its duty to act reasonably in their classification procedure.

27. The Court concludes that Defendant Cho, individually, is afforded the protections of a qualified privilege as to Plaintiff's state law claims because Plaintiff did not prove by clear and convincing evidence that Defendant Cho was motivated by malice and not by an otherwise proper purpose.

28. Based upon the above Findings of Fact and Conclusions of Law, Judgment to be entered for Defendants State of Hawaii, Petra Cho, and Jodie F. Maesaka-Hirata on all claims.

On June 19, 2014, the Circuit Court entered the Judgment in favor of Defendants the State, Cho, and Maesaka-Hirata, and dismissed any and all remaining claims. On July 1, 2014, Gordon timely filed a Notice of Appeal.

II. POINTS OF ERROR

Gordon raises several points of error on appeal, contending that the Circuit Court erred: (1) in finding that Gordon's initial custody level was calculated correctly and then relying upon this finding in determining that individual prison officials acted reasonably; (2) in finding that all Max Custody inmates, whether pretrial or not, are treated under the same conditions as Gordon, and then relying on this finding to

conclude that the restrictions and conditions that Gordon was subjected to did not amount to punishment; (3) in concluding that there was no infringement of Gordon's constitutional rights because Gordon failed to produce substantial evidence showing that Defendants categorized Gordon as a maximum custody pre-trial detainee purely to impose punishment on him; (4) in concluding that the restrictions and conditions Gordon was subjected to did not amount to punishment; (5) in concluding that Cho, in her individual capacity, has qualified immunity from the 42 U.S.C. Section 1983 claims because she did not knowingly violate Gordon's constitutional rights and that Gordon did not suffer punishment; (6) in concluding that all Defendants acted reasonably in considering other factors of Gordon's criminal history to reach the conclusion that he should remain in Max Custody; (7) in concluding that Gordon has not met his burden to demonstrate that the State and or its employees breached their duty to act reasonably in their classification procedure; and (8) in concluding that Cho, in her individual capacity, is afforded the protections of a qualified privilege as to Gordon's state law claims because Gordon did not prove by clear and convincing evidence that Cho was motivated by malice or an otherwise improper purpose.

III. APPLICABLE STANDARDS OF REVIEW

"[A] trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has

been committed." Chun v. Bd. of Trs. of the Emps.' Ret. Sys. of the State of Hawai'i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and ellipses omitted). "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. [The Hawai'i Supreme Court has] defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Leslie v. Estate of Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (internal quotation marks and citations omitted).

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate court] ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Chun, 106 Hawai'i at 430, 106 P.3d at 353 (internal quotation marks, citations, and brackets omitted).

"An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence because this is the province of the trial judge." Porter v. Hu, 116 Hawai'i 42, 60, 169 P.3d 994, 1012 (App. 2007) (quoting State v. Eastman, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996)).

IV. DISCUSSION

A. The Impact of the Initial Custody Classification

Gordon recognizes that FOF 17, regarding the accuracy of the initial custody calculation, is factually correct. Gordon

argues, rather, that the Circuit Court erred because it relied upon FOF 17 in determining that the individual prison officials acted reasonably in deciding the conditions of his pretrial custody. This argument is unconvincing.

In FOF 23, the Circuit Court found that "Defendant Cho testified credibly that the [C]ommittee took into consideration all aspects of Plaintiff's history, including his current offenses, prior convictions, and Plaintiff's statements." In FOF 24, the Circuit Court pointed to Cho's testimony that she and the Committee knew that the 2006 sexual assault charge was no longer pending, but nevertheless concluded that he should remain in Max Custody for the reasons articulated in the Classification Notice. In FOFs 25-27, the court identified the additional reasons stated by the Committee as to why they decided to keep Gordon in Max Custody, including, *inter alia*, his bail amount, his extradition to Hawai'i, his leaving the state without permission while on probation, and his flight risk. As stated in the FOFs, after an Exception Case form was prepared with a recommended custody reclassification as Medium Custody, the DPS Classification Office disapproved it based on, *inter alia*, the violent nature of Gordon's charges, his extensive criminal record, the high bail amount, and unresolved substance abuse issues as reasons.

The Circuit Court also found that Chun "testified credibly that a pretrial detainee can be held as maximum custody based solely on their past behavior and criminal history," and that "based on her training and experience, [she] believed it is

18

reasonable to house an inmate as a maximum security pretrial detainee" based on, *inter alia*, the nature of the current charges, bail amount, criminal history, failure to complete probation, and unaddressed substance abuse issues. As discussed above, the record demonstrates that both the Committee and the DPS Classification Office considered these factors in deciding to keep Gordon at Max Custody.

These findings are well supported by the testimony and other evidence in the record and constitute substantial evidence in support of the Circuit Court's conclusion that the individual prison officials acted reasonably in keeping Gordon in Max Custody.

B.    Whether the Custody Conditions Constituted Punishment

Gordon also recognizes that FOF 50, regarding the consistency of the treatment of Max Custody inmates, is factually correct, but argues that the Circuit Court erred because it relied on FOF 50 in concluding that the restrictions and conditions of Gordon's confinement did not constitute punishment. The gravamen of Gordon's argument, however, is that he should not have been held in Max Custody and, therefore, doing so constituted punishment. This argument is not well-founded.

The Circuit Court concluded, in COLs 15-18, that Gordon produced no evidence that the conditions of his pre-trial detainment were imposed as punishment; rather, the evidence led to the conclusion that the conditions were reasonably related to legitimate government objectives related to the safety and

19

security of the correctional facilities and that they were not excessive for that purpose. Gordon cites no evidence or legal authority that his Max Custody classification constituted punishment, and instead notes that a Medium level classification would have included a number of improvements to his prison life. We recognize the important principle that corrections officials must not act or fail to act in a manner constituting punishment of a pretrial detainee. However, on the totality of the record of this case, we cannot conclude that the Circuit Court erred in determining that Gordon's Max Custody did not constitute pre-trial punishment.

C.    The Classification Procedures and Due Process

Gordon contends that the Circuit Court wrongly concluded that there was no infringement of his constitutional rights and that the court erred by disregarding the substantial evidence presented at trial which demonstrated the arbitrary and capricious manner in which his classification was handled. He argues that prison "policies and regulations may create a liberty interest should they 'impose atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life.'" Estate of DiMarco v. Wyo. Dept. of Corrections, 473 F.3d 1334, 1339 (10th Cir. 2007) (quoting Sandin v. Connor, 515 U.S. 472, 484 (1995)). He further argues that "[c]onditions of incarceration that are harsh, arbitrary, and unrelated to a legitimate governmental objective constitute punishment as does compelling detainees to 'endure genuine privations and hardship

20

over an extended period of time.'"    Anela v. City of Wildwood,
790 F.2d 1063, 1069 (3d Cir. 1986) (quoting Bell v. Wolfish, 441
U.S. 520, 538, 542 (1979)).

As support for his argument that Defendants' actions
and decisions were arbitrary, Gordon points to his "placement in
solitary confinement . . . with the knowledge that [he] was
initially misclassified" and the failure of prison officials to
"exercise reasonable care in properly correcting any
misclassifications according to [the] policies and practices
delineated in the [ACLU Arrangement]" as evidence of a denial of
due process.  He additionally notes that his "eventual
reclassification" was because of a request by HCF's deputy
warden, rather than in accordance with any regular review
process.

In Bell, the United States Supreme Court held that
"pretrial detainees, who have not been convicted of any crimes,
retain at least those constitutional rights that we have held are
enjoyed by convicted prisoners," but "these rights are [] subject
to restrictions and limitations."  441 U.S. at 545.  "A
[pretrial] detainee simply does not possess the full range of
freedoms of an unincarcerated individual. . . .  There must be a
mutual accommodation between institutional needs and objectives
and the provisions of the Constitution that are of general
application."  Id. at 545-46.  The court further held that

> maintaining institutional security and preserving internal
> order and discipline are essential goals that may require
> limitation or retraction of the retained constitutional

rights of both convicted prisoners and pretrial detainees. Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

. . . [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

Id. at 546-48 (internal citations, footnotes, brackets, and quotation marks omitted).

This court has previously held:

[P]risoners do enjoy constitutional protections, although subject to restrictions imposed by the nature of the penal system. Prisoners do retain the procedural due process right not to be deprived of a liberty interest without reasonable notice and a meaningful opportunity to be heard. However, they retain only a narrow range of protected liberty interests, and the adequacy of the procedural protection is flexible and variable dependent upon the particular situation being examined.

Wilder v. Tanouye, 7 Haw. App. 247, 255, 753 P.2d 816, 822 (1988) (citations, brackets, ellipses, and quotation marks omitted).

Other courts have held that "a prisoner has no constitutional right to a particular classification status." See, e.g., Hernandez v. Johnston, 833 F.2d 1316, 1318 (9th Cir. 1987). The Supreme Court in Bell held that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial

detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee." 441 U.S. at 535. The court noted a "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt[,] and regulatory restraints that may." Id. at 537. Thus, while Gordon has no constitutional right to a certain classification, he possesses a right to be free from punishment prior to an adjudication of guilt.

A court must then decide whether the condition is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Bell, 441 U.S. at 538. In evaluating whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of the word, a court must look to whether the restrictions evince a punitive purpose or intent. Clouthier v. Cty. of Contra Costa, 591 F.3d 1232, 1242 (9th Cir. 2010), overruled on other grounds by Castro v. Cty. of Los Angeles, 833 F.3d 1060 (9th Cir. 2016). Absent an express intent to punish, the court must then consider whether punitive intent can be inferred from the nature of the restriction. The determination will generally turn upon

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an

23

alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

Bell, 441 U.S. at 537-38.

Here, the record shows that the Committee met with Gordon, reviewed his case, and recommended that he remain in Max Custody. This recommendation was based on safety and security concerns. The Committee, thereafter, reevaluated Gordon's classification, pursuant to the Rabacal Memo, and recommended to the DPS Classification Office that it be changed to Medium custody. However, the DPS Classification Office and Deputy Director Tommy Johnson denied the recommendation, based on many of the same concerns initially expressed by the Committee. Accordingly, we conclude the Circuit Court did not err in finding and concluding that the classification decisions made by the Committee and the DPS Classification Office were based on the legitimate government objective to maintain a safe and secure correction facility.

Gordon has not shown any evidence of a punitive purpose or intent. See Clouthier, 591 F.3d at 1242. He has not shown that Max Custody classifications "come[] into play only on a finding of *scienter*." See Bell, 441 U.S. at 537-38. He has not shown no "alternative purpose to which it may rationally be connected is assignable for it" or that his classification is "excessive in relation to the alternative purpose assigned." See id. at 538. Additionally, Gordon failed to establish that the procedure detailed in the ACLU Arrangement is guaranteed to him,

or that it somehow supersedes the "wide-ranging deference" accorded to prison officials "in their judgment" that is "needed to preserve internal order and discipline and to maintain institutional security." Id. at 547. Gordon has not shown that his confinement in Max Custody was arbitrary, purposeless, intended as a punishment, or unrelated to a "legitimate nonpunitive governmental objective." Id. at 538, 561. Further, because he has not shown that his classification was intended as a punishment, he has not shown that he was deprived of due process for being punished prior to an adjudication of guilt. See id. at 535; Superintendent v. Hill, 472 U.S. 445, 454 (1985).

The reasons for keeping Gordon in Max Custody were clearly articulated and appear to be related to the legitimate nonpunitive governmental objective of security and safety. Gordon has not shown that he was subject to an arbitrary action of government. See also Wolff v. McDonnell, 418 U.S. 539, 558 (1974).

Gordon's eventual reclassification to a Medium custody level is not inconsistent with this conclusion. According to Lortz's testimony at trial, every Max Custody inmate, whether pretrial or sentenced, is reassessed once a year. Although Gordon's classification was re-evaluated after only eight months, an early review did not cause him any harm and does not demonstrate a denial of due process rights.

We conclude that the Circuit Court did not err in holding that Gordon's due process rights were not violated.

25

D.    Cho's Qualified Immunity

On the issue of qualified immunity or privilege, the supreme court has held that

> non-judicial governmental officials, when acting in the performance of their public duty, enjoy the protection of what has been termed a qualified or conditional privilege. This privilege effectively shields the official from liability, and not from the imposition of the suit itself, to the extent that the privilege is not abused and thereby lost.  Hence, . . . in order for an action to lie against an official acting under a claim of privilege, it is essential that the injured party allege and prove, to the requisite degree, that the official had been motivated by malice and not by an otherwise proper purpose.

Towse v. State, 64 Haw. 624, 632-33, 647 P.2d 696, 702 (1982) (citations omitted).  Here, Gordon argues that, under Awakuni v. Awana, 115 Hawai'i 126, 165 P.3d 1027 (2007), the Hawai'i Supreme Court looked to Black's Law Dictionary for the definition of "malice," in the context of qualified immunity for public officials, and noted that one of the definitions provided is "reckless disregard of the law or of a person's legal rights." Id. at 141, 165 P.3d at 1042 (quoting Black's Law Dictionary 976 (8th ed. 2004)).

Gordon's argument for relief, however, is based on his contention that his classification was mishandled and that the classification procedures clearly constituted a reckless disregard of his rights.  This argument is without merit.  Gordon had no right to a particular security classification.  In each of the classification review proceedings that recommended Max Custody, Cho and the other Defendants articulated legitimate government reasons for their decisions.  We reject Gordon's argument that the Circuit Court's conclusion that the Defendants

26

were not motivated by malice relies solely on self-serving remarks of the Defendant prison officials; rather, the Circuit Court's conclusion was based on Gordon's failure to meet his burden under <u>Towse</u> to establish that Cho was motivated by malice or an otherwise improper purpose. We conclude that the Circuit Court did not err in this regard.

V.    CONCLUSION

For these reasons, the Circuit Court's June 19, 2014 Judgment is affirmed.

DATED: Honolulu, Hawaiʻi, May 30, 2017.

On the briefs:

Eric A. Seitz,
Della A. Belatti,
Sarah R. Devine,
for Plaintiff-Appellant.

Caron M. Inagaki,
Kendall J. Moser,
Deputy Attorneys General,
for Defendants-Appellees,
JODIE F. MAESAKA-HIRATA,
PETRO CHO, and STATE OF HAWAII.

Presiding Judge

Associate Judge

Associate Judge